AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Missouri

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 4:18 MJ 5078 NAB |
| Marantha Health Care, PC (MHC) located at 9231 West | ) | |
| Florissant Avenue, Ferguson, MO as further described in | ) | |
| Attachment A | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Marantha Health Care, PC (MHC) located at 9231 West Florissant Avenue, Ferguson, MO as further described in Attachment A

located in the _____ Eastern _____ District of _____ Missouri _____, there is now concealed *(identify the person or describe the property to be seized)*:
Documents, items and materials more fully described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 287, 1035, 1343, 1347 and 42 USC 1320A-7b | Conspiracy to defraud the Government; False, fictitious or fraudulent claims; False statements related to a health care matter; Wire Fraud; Health Care Fraud; Anti-Kickback Statute |

The application is based on these facts:
See attached affidavit which is incorporated herein by reference

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_

SA Stacey Jordan; HHS Office of Inspector General
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ 03/23/2018 _____

_Judge's signature_

City and state: St. Louis, MO

Hon. Nannette A. Baker; U.S. Magistrate Judge
_Printed name and title_

I, Stacey L. Jordan, being duly sworn, depose and say:

## INTRODUCTION

1.  Affiant is a special agent with the United States Department of Health and Human Services, Office of the Inspector General, Office of Investigation (HHSOIG), where she has been employed since October 2005. Affiant is assigned to the Kansas City Regional Office of HHS/OIG and works in the St. Louis, Missouri Field Office. The St. Louis Field Office includes Eastern Missouri and Central and Southern Illinois. While working for HHS/OIG, Affiant has investigated alleged crimes against the United States, including healthcare related crimes.

2.  Affiant has a Bachelor of Science degree in nursing from Saint Louis University, St. Louis, Missouri. Affiant is a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. Affiant has received extensive training in conducting healthcare fraud investigations.

3.  This affidavit is made in support of an application for a warrant to search the premises of two separate health care clinics, **Maranatha Health Care, PC (MHC) located at 9231 West Florissant Avenue, Ferguson, Missouri,** and **Physicians Health Group Medical, Inc. (PHGM) located at 960 S. Highway Drive, Fenton, Missouri,** both of which are within the Eastern District of Missouri. Each clinic is further described as follows:

     a.  MHC located at 9231 West Florissant Avenue, Ferguson, Missouri, is a single-story tan brick building with dark stone front, as pictured in Attachment A. On the front of the building is a green canopy over the entrance, and there is a large white sign to the right of the entrance, on which the following words and numbers appear: "Maranatha PHYSICIANS," and the phone number of the clinic. The front of 9231 West Florissant Avenue has glass entry doors, with the number "9321" above the doorway. There is a handicap accessible access ramp to the left of the entrance. On the right side of the building, there are five windows and another door, which is also covered by a green canopy.

     b.  PHGM located at 960 S. Highway Drive, Fenton, Missouri is located within a single story strip mall. The strip mall is red brick, containing multiple businesses,

1

each business having large windows on each side of a glass door entry. There is a blue overhang, just below the brown roof and above the glass windows, on the section of the strip mall, which PHGM occupies. There are no signs, or other markings, on PHGM's location to signify it is the space for PHGM, only the numbers 960 in white above the door.

4.      MHC was originally incorporated in the State of Missouri as A.G. Lipede, M.D., P.C. (AGL) on February 13, 1987. Dr. Adeluola G. Lipede organized AGL. On May 1, 1987, AGL's name was changed to CVT, P.C. (CVT). Then on June 23, 1987, CVT changed its name to MHC. MHC does not have a website, but Internet searches revealed MHC is a family practice clinic, with hours Monday through Friday, from 9am to 5pm. According to the Internet site WebMD, there are two providers listed for MHC, Dr. Lipede and nurse practitioner Irina Palatnik (Palatnik).

5.      Christopher Kavanaugh (Kavanaugh) originally incorporated PHGM, in the State of Missouri on October 12, 2010. Kavanaugh is listed as PHGM's owner, President, Secretary, and Director. PHGM does not have a website. Internet searches reveal that PHGM is a pain medicine clinic, with hours Monday through Friday, from 9am to 5pm. According to the Internet site "Health Care for People," PHGM has one provider listed, Dr. Lipede. In addition, when requesting Medicare claims data, Affiant learned that Dr. Lipede is the only provider submitting claims from PHGM.

6.      The Missouri Board of Healing Arts (Board) records reveal Dr. Lipede is a licensed physician in the State of Missouri.

7.      Dr. Lipede has his own National Provider Identifier or NPI number, a unique number issued to health care providers by the Centers for Medicare and Medicaid Services (CMS). The NPI is the required identifier that providers must use to submit claims to Medicare, Medicaid, and most commercial healthcare insurance companies.

8.      Medicare and Medicaid records indicate Dr. Lipede is an enrolled health care provider in both programs.  Dr. Lipede is responsible for maintaining Medicare and Medicaid billing records, private insurance billing records, and corresponding patient files for services rendered to patients, as further explained in paragraphs 18 and 22 of this affidavit.  As a result of Affiant's investigation, Affiant knows that Dr. Lipede promised in his Medicare and Medicaid provider applications to keep and store medical records at 9231 West Florissant Avenue, Ferguson, Missouri, and at the office of PHGM, located at 960 S. Highway Drive, Fenton, Missouri.  Affiant further knows that such records, as described herein, are maintained both in hardcopy/paper form and on computer systems located at MHC, and paper form at PHGM.  In my experience as an agent, I know Medicare claims are submitted electronically, and therefore PHGM would be utilizing their computer system to transmit Medicare claims data.  On October 5, 2015, PHGM completed an application for consent to participate in Medicare's Electronic Data Interchange (EDI), which would allow PHGM to submit/receive claims, claim attachments, remittances, eligibility/benefits, claim status, and other information electronically through their Third Party/Clearinghouse/Software vendor.

9.      Affiant seeks to search the premises of MHC and PHGM for property that constitutes evidence of the commission of criminal offenses, contraband, the fruits of a crime, or things otherwise criminally possessed, or property or computerized information, storage media or paper documentation designed or intended for, or which is or has been used as the means of committing, facilitating, or concealing a criminal offense, in violation of Title 18, United States Code, Sections 371 (Conspiracy to Defraud the Government or Commit an Offense against the Government), 287 (False, Fictitious or Fraudulent Claims), 1035 (False Statements related to Health Care Matters), 1343 (Wire Fraud),  1347 (Health Care Fraud), and Title 42, United States

Code, 1320a-7b (Anti-Kickback Statute). Such items sought to be seized are listed in Attachment D, attached hereto and incorporated by reference.

10.    Affiant is requesting authority to search the premises of both MHC, located at 9231 West Florissant Avenue, Ferguson, Missouri, and PHGM, located at 960 S. Highway Drive, Fenton, Missouri. Affiant believes that the requested records will show Dr. Lipede utilized his NPI number (necessary for payment as a provider under Medicare, Medicaid, and other healthcare insurance providers) to submit claims for services he did not perform. Further, Affiant believes the records will show MHC, PHGM, and Dr. Lipede knowingly submitted false claims to Medicare, Medicaid, Tricare, and other healthcare insurance providers for services, including medical examinations and evaluations, for prescription drugs without a legitimate prescription, received "kickbacks" from other health care providers in exchange for referrals, and otherwise billed for services not provided. Such practices resulted in Dr. Lipede receiving reimbursement for non-covered services, or for services for which he was not entitled to receive reimbursement. Further, Affiant believes that the records will show Dr. Lipede knowingly wrote prescriptions for controlled substances and other drugs, for Medicare and Medicaid beneficiaries, in exchange for illegal kickbacks, thus causing false claims to be submitted to Medicare and Medicaid.

11.    The information set forth in this affidavit is based on Affiant's personal observations, examination of relevant documents, and discussions with individuals familiar with MHC, PHGM, and Dr. Lipede. The records obtained and analyzed for the purpose of this application were obtained from the Missouri State Board of Healing Arts, the Medicaid Fraud Control Unit (MFCU) of the Missouri Attorney General's Office, fiscal and program contractors of Medicare, the Missouri Secretary of State, Lexis Nexis, AdvanceMed Corporation, and Health

Integrity, LLC. AdvanceMed is the Unified Program Integrity Contractor (UPIC) for the

Medicare Program in the Eastern District of Missouri. Health Integrity is the Medicare Drug

Integrity Contractor for the Eastern District of Missouri. AdvanceMed, Health Integrity, and the

MFCU are responsible for collecting and maintaining information, including billing data for

providers (such as Dr. Lipede) and are responsible for preventing and detecting fraud within the

Medicare and Medicaid program. Since Affiant submits this affidavit for the limited purpose of

supporting an application for a search warrant, it does not set forth every fact that Affiant or

others have learned during the course of this investigation.

### Relevant Medicare Provisions

12.     The United States Department of Health and Human Services, through the Centers

for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a

federal health benefits program for the elderly and disabled. Medicare Part B reimburses health

care providers for covered health services that they provide to Medicare beneficiaries in

outpatient settings.

13.     Medicare Part B reimburses enrolled doctors and other authorized health care

professionals for office visits. These visits are often referred to as evaluation and management

services or E&M services.

14.     Medicare Part D provides reimbursement for prescription drugs provided to

Medicare beneficiaries enrolled in Medicare Part D. Medicare reimburses a pharmacy or

pharmacy plan only if a physician or other authorized health care provider has legally prescribed

or ordered the medication or drug.

15.     CMS acts through fiscal agents called Medicare Administrative Contractors or

"MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private

5

entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation (WPS) is the Part B MAC for Eastern Missouri and thus processes claims for Medicare reimbursement. There are numerous prescription benefit managers for the Medicare Part D program that process prescription claims for Medicare reimbursement.

16.     To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.

17.     To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare rules and regulations. The Medicare provider agreement requires a provider to certify:

a. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

b. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

18.     Medicare providers must retain clinical records for the length of time required by state law or five years from the date of discharge if there is no requirement in state law. For the state of Missouri, Missouri Statute 334.097 states, "Patient records remaining under the care, custody, and control of the licensee (physician) shall be maintained by the licensee of

6

the board (Board of Healing Arts), or the licensee's designee, for a minimum of seven years from

the date of when the last professional service was provided."

### Relevant Missouri Medicaid Provisions

19.     MO Healthnet, a division of the Missouri Department of Social Services,

administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and

the federal government.  Missouri Medicaid reimburses health care providers for covered

services rendered to low-income or disabled Medicaid recipients.

20.     A Medicaid provider must enter into a written agreement with MO Healthnet to

receive reimbursement for medical services provided to Medicaid recipients, and must agree to

abide by MO Healthnet's regulations in rendering and billing for those services.  The Medicaid

program reimburses providers for various health care related services, to include prescription

drugs.  Prescription drugs are reimbursed when prescribed in the normal course of medical

practice, for a legitimate medical purpose, by a qualified physician acting within the scope of

their license.

21.     Included in the application and participation agreement are various promises and

attestations that providers will comply with the rules of the program, and the requirement to

comply with all regulations to the proper and accurate submission of claims.  Part of the

application reads:

> By my signature below, I, the applying provider, read and agree that…I am
> responsible for all services provided and all billing done under my provider
> number regardless to whom the reimbursement is paid.  It is my legal
> responsibility to ensure the proper billing code is used and indicate the length of
> time I actually spend providing a service…I agree the Missouri Title XIX
> Medicaid manual, bulletins, rules, regulations, and amendments thereto shall
> govern and control my delivery of service.

22.     Medicaid providers must retain, for five years from the date of service,

7

fiscal and medical records that reflect and fully document services billed to Medicaid, and must furnish or make the records available for inspection or audit by the Department of Social Services or its representatives upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

### Relevant Tricare Provisions

23. Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency (DHA) is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare. Contracted Tricare providers are obligated to abide by the rules, procedures, policies, and program requirements as specified in the Tricare Provider Handbook. Under Tricare regulations, providers of medical services must provide information and records to Tricare or its fiscal intermediaries on request in order to receive payment.

### Current Procedural Terminology Codes

24. In presenting claims to Medicare, Medicaid, Tricare, and other healthcare insurance providers use numeric "codes" taken from a manual of Physicians Current Procedural Terminology, known as "CPT Codes," to describe the service they provided. CPT codes are developed by the American Medical Association (AMA), and its body of physicians of every

8

specialty, who determine appropriate definitions for the codes. By submitting claims using these CPT codes, providers represent to Medicare, Medicaid, Tricare, and other healthcare insurance providers, that the services described by the codes were, in fact, provided. Reimbursement rates for the CPT codes are set through "fee schedules" created by Medicare and other federal programs. The fee schedule outlines the maximum amount the government will reimburse the provider for a given service. The fee for a given service may vary depending on the type of health care professional providing the service.

25.     Medicare, Medicaid, Tricare, and other healthcare insurance providers use Evaluation and Management (EM) CPT codes 99201-205 and 99211-215 for the billing of office visits by physicians, with these codes covering services for the various lengths of time (lengths of times are advisory, not mandatory) that a physician typically spends face-to-face with the patient. CPT 99211 involves payment for a visit with a physician, when the presenting problem(s) are minimal, and typically, the physician spends five minutes performing services. The CPT guidance for 99211 notes some office visits billed under this code "may not require the presence of a physician." The other office visit codes, 99212-215, involve time frames between 10-40 minutes, with the CPT guidance for each of these codes specifically stating that "the physician" typically spends the relevant time periods specified in each of these codes "face-to-face with the patient and/or family."

26.     CPT codes 99231-233 cover "subsequent hospital care," while CPT codes 99221-223 cover "initial hospital care" and CPT codes 99238 and 99239 cover "hospital discharge day." When properly presented in a claim for payment to the Medicare, Medicaid, Tricare, and other healthcare insurance providers, these CPT codes generally reimburse physicians for evaluating and managing a patient's care in a hospital setting. The CPT code

guidance states that "physicians typically spend" 15-70 minutes "at the patient's bedside and on the patient's hospital floor or unit" before billing these codes.

27.     CPT codes 99347-350 cover a "home visit."  When properly presented in a claim for payment to Medicare, Medicaid, Tricare, and other healthcare insurance providers, these CPT codes generally reimburse physicians for evaluating and managing a patient's care in a private residence setting.  The CPT code guidance states that "physicians typically spend" 15-60 minutes "face-to-face with the patient and/or family" before billing these codes.

28.     WPS is the MAC for the Eastern District of Missouri, as noted in paragraph 15. WPS not only responsible for reviewing, processing, and paying Medicare claims, they also provide education to Medicare providers to ensure the services they provide to Medicare beneficiaries are properly documented and coded.  Periodically, WPS performs analysis on provider-coding patterns to determine if a provider is deviating from his/her peer group.  On December 28, 2011, Dr. Lipede received a letter from WPS notifying him, for dates of service June 1, 2010 to May 31, 2011, he was aberrant in his billing of CPT code 99214 (evaluation and management of an established patient and the second highest level).  Dr. Lipede's billing pattern of CPT code 99214 was problematic, because there was little to no variation in the level of his services.  Dr. Lipede was submitting claims for evaluation and management of patients with CPT code 99214 at least 97% of the time, whereas his peers submitted claims utilizing CPT code 99214 at least 30% of the time.  WPS took no action against Dr. Lipede they were only educating him on his billing pattern.

29.     On October 21, 2015, Coventry Health Care, Inc., an Aetna Company, filed a complaint with the Board alleging Dr. Lipede was billing CPT code 99214 almost exclusively. Aetna's review of Dr. Lipede's claims occurred from September 2014 to October 2015, with a

projected loss of $48,795.00. On July 7, 2016, an investigator with the Board met with Dr.

Lipede. Dr. Lipede stated he was aware of Aetna's complaint regarding his coding of evaluation

and management of patients seen in his office. Dr. Lipede informed the investigator, Aetna was

a very difficult company to work with, that they dispute a large amount of claims and refuse to

pay him. Dr. Lipede stated he felt Aetna wanted him to spend less time with his patients and not

do a thorough exam, but his patients have multiple medical problems and he wants to address

them all. Dr. Lipede told the investigator he planned to be honest and bill according to the time

he spent with his patients. Dr. Lipede also stated that Aetna is the only insurance company that

has had any problems with the way he codes his evaluation and management of patient visits.

30.     Under some circumstances non-physician practitioners, such as nurse practitioners

and physician assistants, may bill Medicare, Medicaid, Tricare, and other healthcare insurance

providers for the aforementioned EM CPT codes in the office, hospital or private residence

setting.  The non-physician practitioners receive reimbursement at a lower rate due their

credentialing and qualifications. More specifically, nurse practitioner and physician assistant

services are paid at eighty to eighty-five percent of what a physician is paid under the Medicare

Physician Fee Schedule. Non-physician practitioners are required to use their NPIs to receive

proper payment and maintain program integrity, by identifying they are the provider of the

services. Since at least 2005, Palatnik has had her own NPI number for submitting claims.

31.     According to an internet posting for MHC, Dr. Lipede employed one nurse

practitioner, Palatnik. Affiant met and interviewed Palatnik in 2012. Affiant met Palatnik,

during the investigation of another physician that employed Palatnik from 2001 to 2012. During

Palatnik's October 12, 2012 interview, Palatnik stated she worked for Dr. Lipede, and that Dr.

Lipede accompanied her when she was with patients. In reviewing claims for MHC and PHGM,

11

Affiant did not find any claims identifying Palatnik as a provider of services. Instead, Medicare

claims submitted using Palatnik's NPI, are associated with Domus Medical House Calls, LLC

(Domus). All of the claims submitted by Domus, with Palatnik as the provider, were for visits

with patients in their homes, or at nursing facilities. Medicare found no other claims under

Palatnik's NPI number as the provider, except for Domus. When Task Force Officers (TFO)

with the Drug Enforcement Administration (DEA) went to MHC on March 1, 2017, the only

provider at MHC was Dr. Lipede; neither Dr. Lipede nor his office staff mentioned a nurse

practitioner, or Palatnik.

### Drugs, Schedules, Applicable Regulations, and Guidelines

32.     U.S. Code of Federal Regulation, 21 C.F.R. § 1306.04(a), provides in relevant part

that: "a prescription for a controlled substance to be effective must be issued for a legitimate

medical purpose by an individual practitioner acting in the usual course of his professional

practice. The responsibility for the proper prescribing and dispensing of controlled substances is

upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist

who fills the prescription. An order purporting to be a prescription issued not in the usual course

of professional treatment or in legitimate and authorized research is not a prescription ... and the

person knowingly filling such a purported prescription, as well as the person issuing it, shall be

subject to the penalties provided for violations of the provisions of law relating to controlled

substances."

33.     U.S. Code of Federal Regulation, 21 C.F.R. § 1306.05(a), provides that:

"All prescriptions for controlled substances shall be dated as of, and signed on, the day when

issued and shall bear the full name and address of the patient, the drug name, strength, dosage

form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

34.     Under federal and Missouri law, only a medical doctor can prescribe drugs containing controlled substances listed in Schedule II (for example Morphine).  However, under some circumstances, a physician assistant may be able to prescribe Schedule III or IV drugs to patients, but only if the prescription is under the supervision of a medical doctor through a collaborative practice agreement, the physician assistant uses his or her own Drug Enforcement Administration (DEA) registration number for the prescription, the prescription is not automatically re-fillable, and the prescription contains less than a five day supply of drugs.  21 U.S.C. § 829(a); Missouri Revised Statutes, Section 334.104, 334.747.

35.     According to an internet posting for MHC, and an October 2012 interview, Dr. Lipede employed one nurse practitioner, Palatnik.  Palatnik does not have an independent registration with the DEA to prescribe medications.  Palatnik's ability to prescribe medications is circumscribed by the laws noted in paragraph 23.  Therefore, Dr. Lipede was the only provider at MHC who could prescribe a Schedule II controlled substance, or a 30-day supply of a Schedule III-V controlled substance.

### Review of Travel Data

36.     Affiant requested information regarding Dr. Lipede's travel history.  Affiant received information regarding Dr. Lipede's travel, from Airline Reporting Corporation (ARC).  ARC provides airline travel intelligence upon request from law enforcement.  ARC reported the following travel dates, and travel destinations, for Dr. Lipede:

      a.   10/25/14 to 11/2/14 - Flight from St. Louis to Dubai, UAE
      b.   2/26/15 to 3/1/15 - Flight St. Louis to Mobile, AL
      c.   8/7/15 to 8/17/15 - Flight St. Louis to Munich, Germany
      d.   6/1/16 to 6/15/16 - Flight St. Louis to Miami, FL

13

    e.   7/1/16 to 7/4/16 - Flight to Washington, DC

    f.   2/2/17 to 2/5/17 - Flight St. Louis to Cancun, Mexico

    g.   5/12/17 to 5/14/17 - Flight St. Louis to Houston, TX

37.    A review of Medicare claims data, for the above dates when Dr. Lipede was out of town, revealed that 100 claims were submitted for face-to-face visits with Dr. Lipede, under his NPI, for both evaluation and management codes, as well as treatments. Affiant then reviewed the prescription drug claims for all controlled substances prescribed by Dr. Lipede while he was out of town. Affiant focused on controlled substance prescriptions, due to the requirements described in paragraphs 22 and 23. Only a physician can prescribe Schedule II drugs, and all controlled substance prescriptions must be dated and signed the day they are prescribed. During the travel dates listed above, Dr. Lipede prescribed 161 Schedule II controlled substances, such as Fentanyl, OxyContin, Morphine, and Oxycodone. Affiant believes Dr. Lipede was out of town when the prescription was "written," because in reviewing the Medicare claims data a majority of the Schedule II prescriptions were billed by pharmacies (which usually represents the prescription was filled on that day) on the same day a claim for a face-to-face encounter was submitted utilizing Dr. Lipede's NPI. In other words, 55 patients had their Schedule II prescriptions, under Dr. Lipede's DEA number, billed by a pharmacy on the same day, or the day after, Dr. Lipede was listed as the provider of a face-to-face claim submitted for a date he was out of town. Many of these patients received more than one Schedule II medication on the same day. This would make it appear as if Dr. Lipede provided a face-to-face evaluation of the patient and wrote the Schedule II prescription, when in fact he was out of town on that day. In my experience, patients receiving Schedule II medications do not hold onto their prescriptions for days to a week to refill their medications, in reviewing the Medicare claims data, these patients were filling their Schedule II prescriptions every 30 days.

14

In addition, Dr. Lipede was the only provider in his practice capable of prescribing any controlled substance for a 30-day period.  During the travel dates listed above, Dr. Lipede prescribed 113 Schedule III - V controlled substances, such as Ativan, Valium, and Xanax.

38.     A review of Medicaid claims data for the above dates when Dr. Lipede was out of town, revealed 34 claims were submitted using evaluation and management codes for face-to-face visits with Dr. Lipede.  Affiant then reviewed the prescription drug claims for all controlled substances prescribed by Dr. Lipede while he was out of town.  During the travel dates listed above, Dr. Lipede prescribed 122 Schedule II controlled substances, such as Fentanyl, OxyContin, Morphine, and Methadone.  Pharmacies submitted claims for over 90 of those Schedule II prescriptions, (again this usually represents the prescription was filled on that day), on dates that were 5 days, or more, after Dr. Lipede left town.  Dr. Lipede was the only provider in his practice capable of prescribing any controlled substance for a 30-day period.  During the travel dates listed above, Dr. Lipede prescribed 160 Schedule IV - V controlled substances, such as Ativan, Valium, and Xanax.

39.     A review of Tricare claims data for the above dates Dr. Lipede was out of town, revealed 2 claims were submitted for face-to-face visits with Dr. Lipede, for evaluation and management codes.

40.     A review of United Healthcare claims data for the above dates Dr. Lipede was out of town, revealed 5 claims were submitted for face-to-face visits with Dr. Lipede, for evaluation and management codes.

**Information from DEA**

41.     On May 9, 2016, the DEA received an anonymous call from an individual claiming to be a former patient of Dr. Lipede.  The caller claimed he had been a patient of Dr.

Lipede's for two years and was concerned about Dr. Lipede's prescribing habits. The caller stated that he was aware of three of Dr. Lipede's patients who had recently died from prescription pill overdoses. (DEA could not confirm those deaths.) The caller stated the first time he went to Dr. Lipede, Dr. Lipede wrote prescriptions, without questioning the caller, for all of the medications the caller previously was prescribed. Dr. Lipede does not require patients to provide their previous medical records, submit to blood tests, have an x-ray/MRI, nor does he conduct a physical examination. The caller stated Dr. Lipede does accept insurance, but also accepts $150.00 cash per visit. The caller also stated he has heard patients in the waiting room discuss selling the medications Dr. Lipede prescribes them, and how freely Dr. Lipede prescribes medications.

42.     On August 23, 2016, DEA Task Force Officers (TFO) observed two patients leaving PHGM in a car with Kentucky license plates. After following the car, which tried to allude the DEA TFO vehicle, the vehicle was located at a nearby Walgreens. When the patients exited the store, the DEA TFOs identified themselves as "police" and asked the patients about the visit with Dr. Lipede and prescriptions. Patient R.G. stated he lives in Kentucky, where he was a coal miner. R.G. lost his job and medical insurance. R.G. stated physicians in Kentucky would not treat him, but would not give a reason why. R.G. stated he found Dr. Lipede on a website and has been to Dr. Lipede 3 or 4 times for back pain. R. G. stated he pays cash for his appointments with Dr. Lipede. R.G. will make the 7 hour drive, sleeping at rest stops along the way, to see Dr. Lipede. R.G. eventually admitted to the DEA TFOs, he is addicted to Oxycodone, but never told Dr. Lipede.

43.     The second patient K.G., stated that R.G. was her step-son, and she heard about Dr. Lipede from him. K.G. went to Dr. Lipede for spina bifida and received a prescription for

Oxycodone. DEA TFOs explained to K.G. and R.G., the prescriptions for Oxycodone were going to be seized, due to R.G. admitting he was addicted. K.G. told the DEA TFO, even though she had paid Dr. Lipede $250.00 for the prescription, "she didn't want to be a part of this."

44.     After seizing the prescriptions, the DEA TFOs went back to PHGM to talk to Dr. Lipede. DEA TFOs met with Dr. Lipede and the owner of PHGM, Kavanaugh and his wife Jean Kavanaugh (Jean). The DEA TFO asked Dr. Lipede if he had patients from Kentucky with the last name of "G." Dr. Lipede stated he has patients from Kentucky with the last names of "C." Jean confirmed for the patient's names were "G." The DEA TFO informed Dr. Lipede there was a seizure of prescriptions written by him, due to R.G. being addicted to Oxycodone. Dr. Lipede stated he asked R.G. if he was addicted, and R.G. said, "No." Dr. Lipede asked the DEA TFOs, what signs he should look for regarding drug addicts. The DEA TFO informed Dr. Lipede as a physician he should know, but it should be a red flag if an individual drives 7 hours from Kentucky to see him.

45.     On October 12, 2016, DEA performed surveillance of PHGM. During a four hour period, from 2:15 p.m. until 6:35 p.m., DEA observed 49 individuals enter, and leave with something in their hand, presumably prescriptions. With 49 patients visits occurring in 260 total minutes, there was approximately five minutes available for each patient examination on October 12, 2016. In my training and experience, it would be hard for a doctor to repeatedly take a complete medical history, perform a medical examination, and make reliable medical and prescription decisions for patients with serious complaints of pain under these time constraints. Two of the individuals who entered the building during this period was D.K. and T.H.

46.     Later that day, on October 12, 2016, while DEA was conducting an investigation at a Walgreens near PHGM, a DEA TFO recognized D.K. and T.H. from the surveillance DEA

had conducted.  The DEA TFO observed T.H. and D.K. selling prescription medication to J.P.

Upon arrival of additional DEA team members, T.H., D.K., and J.P. were detained, and read

their Miranda rights.

47.     On October 12, 2016, T.H. stated he is a drug user, recently released from prison.

T.H. stated he went with D.K. to his appointment with Dr. Lipede.  D.K. received a prescription

from Dr. Lipede for Oxycodone and Xanax, which they were filling at the Walgreens.  T.H.

stated D.K. acted as the intermediary, collecting $700.00 from J.P., in exchange for 70

Oxycodone pills prescribed by Dr. Lipede.  T.H. stated he is also a patient of Dr. Lipede, but did

not have an appointment today.  T.H. described Dr. Lipede's office as a "pill mill," and it is

common knowledge among drug users that Dr. Lipede will prescribe medication with any

medical excuse.  T.H. stated Dr. Lipede's office only accepts cash, no insurance is accepted, and

he pays $250.00 per visit.

48.     DEA resumed their surveillance of PHGM at 9:30 p.m.  DEA observed several

patients exiting the clinic until 12:05 a.m.  At 12:30 a.m., DEA went to the nearby Walgreens

and found the last patients who exited PHGM.  The last two patients were from Lonedell, a 50-

minute drive to Fenton.  The patients were D.P. and N.P., husband and wife, 32 and 31 years-

old.  Both D.P. and N.P. suffered back injuries in the past, and were being treated by Dr.

Lipede.  This was N.P.'s first visit to Dr. Lipede since her husband referred her.  D.P. had been

a patient of Dr. Lipede's for the past year.  D.P. stated he has not done physical therapy for his

back injury because of his insurance.  D.P. stated PHGM only accepts cash.

49.     N.P. stated her appointment with Dr. Lipede cost $200.00, and lasted 40 minutes.

The appointment consisted of a female taking her blood pressure and checking her weight, and

then Dr. Lipede felt her back.  N.P. stated she was told to provide the office with an x-ray for

18

their file.  Dr. Lipede wrote N.P. a prescription for Oxycodone.

50.     On June 28, 2017, DEA performed surveillance of PHGM.  During a five hour period, from 2:15 p.m. until 7:00 p.m., DEA observed 38 individuals enter, and leave with something in their hand.  DEA believed the item was a prescription.

51.     At 3:10 p.m., DEA observed one of those individuals leaving PHGM in a vehicle with Kentucky license plates.  DEA followed the vehicle to a nearby Walgreens.  The driver of the car, B.A., was approached by DEA, and agreed to answer questions.  B.A. stated he had been a patient of Dr. Lipede's for three years and sees him for injuries he suffered in an oil rig accident a few years ago.  B.A. showed DEA his left hand, which was missing three fingers, and the back of his neck had a large bulge.  B.A. stated he sees Dr. Lipede once a month and receives prescriptions for Xanax, Oxycodone, and a blood pressure medication.  B.A. stated he drives from Illinois to see Dr. Lipede because he has trouble finding a physician in Illinois who will prescribe him the medications Dr. Lipede does.  B.A. stated other physicians tell him to take Ibuprofen, which is not sufficient for his injuries.  B.A. does not believe he is addicted to his medications and could stop them anytime.  B.A. stated he has Kentucky license plates because he recently bought the vehicle from his family in Kentucky.

52.     DEA also spoke to B.A.'s female passenger, his fiancé S.H.  S.H. stated she has lived with B.A. in Hazard, Kentucky for the past two years.  S.H. stated B.A. is on Medicare.  S.H. stated B.A. had to travel to the doctor's office, (S.H. did not know Dr. Lipede's name) because the physicians in Kentucky would not prescribe the medications B.A. needed, but could not give a specific reason why.

53.     Affiant reviewed Medicare claims for B.A. submitted by Dr. Lipede.  Affiant found office and prescription drug claims, from July 2015 to December 2017.  On the date B.A.

was questioned by DEA, June 28, 2017, there were prescription drug claims for Lisinopril

(blood pressure), Methadone, Xanax, and Oxycodone for B.A., all prescribed by Dr. Lipede.

54.    On March 1, 2018, DEA made a visit to MHC.  Office manager Lisa Campbell

(Campbell) spoke with DEA regarding the records storage and filing system.  Campbell stated

MHC maintained records in both paper and electronic form, and showed DEA the movable

shelving system, which held the patient files.  When asked about patient files at PHGM,

Campbell stated PHGM is completely separate from MHC, and she had no knowledge of that

clinic.

55.    DEA then spoke with Dr. Lipede, who confirmed what Campbell had told them,

regarding the patient records.  Dr. Lipede stated he was in the process of burning, on site,

patient files that were over ten years old.  When asked if Dr. Lipede had patient files at PHGM,

he stated he did, but only in paper form.  Dr. Lipede stated he worked at MHC on Wednesdays,

and performs home visits on Thursdays.

56.    Affiant reviewed Medicare and Medicaid claims to see if there were only claims

for Dr. Lipede on Wednesdays at PHGM.  Affiant reviewed claims from May 2015 to

December 2017, and found claims submitted by Dr. Lipede were not limited to Wednesdays.

The following chart provides some examples of other days of the week Dr. Lipede submitted

claims for services provided at PHGM.

| Date | Day of the Week | Number of Claims Submitted With Dr. Lipede as the Provider of the Service |
| --- | --- | --- |
| 1/6/2016 | Wednesday | 19 office visits |
| 1/8/2016 | Friday | 1 office visit |
| 8/23/2016 | Tuesday | 12 office visits |
| 2/9/2017 | Thursday | 12 office visits |
| 7/1/2017 | Saturday | 11 office visits |

In fact, when compiling all Medicare and Medicaid claims data for Dr. Lipede, at least

according to the Medicare and Medicaid billing data, some months Dr. Lipede worked every day of the month except for 2-4 days of the month.

### Further Claims Data Analysis

57.     Affiant did further analysis of Dr. Lipede's Medicare and Medicaid claims, focusing on controlled substance prescriptions. Affiant found a number of patients who died shortly after receiving controlled substance prescriptions from Dr. Lipede. Affiant focused on patients under the age of fifty, who died within thirty days of receiving a Schedule II prescription. In reviewing Medicare claims, Affiant found Dr. Lipede had prescribed a thirty-day prescription, consisting of 60 to 180 pills of Oxycodone/Acetaminophen, Oxycodone, or OxyContin. Other results from the review are as follows:

| Miles from Patient to Dr. Lipede | # Days from Schedule II Prescription to Death | Date of Death | Age at Death |
|---|---|---|---|
| 171 | 6 | 4/3/2014 | 47 |
| 6 | 4 | 4/13/2014 | 29 |
| 6 | 15 | 8/5/2014 | 47 |
| 3 | 2 | 1/15/2015 | 26 |
| 63 | 2 | 12/9/2016 | 48 |
| 76 | 2 | 12/17/2016 | 34 |
| 6 | 18 | 1/1/2017 | 48 |
| 8 | 2 | 3/10/2017 | 45 |
| 2 | 24 | 9/30/2017 | 42 |

58.     In reviewing Medicaid claims, Affiant found Dr. Lipede had prescribed a thirty-day prescription, consisting of 60 to 180 pills of Oxycodone/Acetaminophen, Oxycodone, and Duragesic Patches. The Medicaid patients received multiple controlled substance prescriptions from Dr. Lipede. Other results from the review are as follows:

21

| # Controlled Substances Received Month Before Death | # Days from Schedule II Prescription to Death | Date of Death | Age at Death |
|---|---|---|---|
| 3 - all within 15 days of death | 9 | 10/30/2014 | 48 |
| 2 | 5 | 8/21/2015 | 28 |
| 4 - all 10 days of death | 10 | 3/25/2016 | 45 |

59. In reviewing Medicare Schedule II claims data, Affiant focused on patients who received Schedule II prescriptions on more than two occasions. Three of the patients listed below died within six days of receiving their Schedule II prescription/s from Dr. Lipede:

| Patient's Home City | Patient's State | Miles from Patient to Dr. Lipede |
|---|---|---|
| Saint Louis | MO | 3 |
| Saint Ann | MO | 8 |
| Saint Louis | MO | 9 |
| Granite City | IL | 16 |
| Cedar Hill | MO | 44 |
| Warrenton | MO | 51 |
| Union | MO | 60 |
| Cadet | MO | 70 |
| Cadet | MO | 70 |
| Park Hills | MO | 75 |
| Leslie | MO | 76 |
| Sullivan | MO | 77 |
| Sullivan | MO | 78 |
| Potosi | MO | 81 |
| Owensville | MO | 93 |
| Cuba | MO | 99 |
| Fulton | MO | 102 |
| Columbia | MO | 124 |
| Patterson | MO | 134 |
| Carmi | IL | 143 |
| Houston | MO | 163 |
| Peoria | IL | 171 |
| Neelyville | MO | 177 |
| Dexter | MO | 180 |

| Hazard | KY | 456 |
| Silver Creek | MS | 561 |
| New Orleans | LA | 692 |

60.    According to information obtained during the investigation, both MHC and

PHGM are only open during the week.  A review of Medicare and Medicaid claims data, shows

that claims were submitted by Dr. Lipede for services provided on the weekend.  Affiant focused

on the claims for evaluation and management services provided in an office, excluding the

possibility that these "weekend services" claims reflected at-home patient care.  For patients who

had an evaluation and management claim, Affiant reviewed prescription drug claims to see if

there was a corresponding claim for a Schedule II drug.   The following chart represents the

results for a one-year period:

| Weekend Days Worked | Number of Office Visits | Number of Patients Who Filled At Least One Schedule II Prescriptions |
| --- | --- | --- |
| 1/7/2017 | 20 | 10 |
| 2/25/2017 | 4 | 3 |
| 3/5/2017 | 2 | 0 |
| 4/8/2017 | 11 | 10 |
| 4/22/2017 | 2 | 0 |
| 5/6/2017 | 5 | 2 |
| 7/1/2017 | 8 | 6 |
| 9/23/2017 | 9 | 0 |
| 10/14/2017 | 13 | 7 |
| 1/6/2018 | 12 | 5 |

The patients in this list received one to five controlled substances, paid for by Medicare or

Medicaid, at their visit with Dr. Lipede.  This does not account for prescriptions filled, and paid

by cash.

61.    Many of Dr. Lipede's patients travel long distances for their office visits.

However, there are physicians in each of the far away cities these patients travel from, who are capable of providing pain management and internal medicine services in an office setting. In addition, Medicare and Medicaid patients are either elderly, disabled, or low income. These individuals usually do not, or cannot, travel long distances for care, unless for some special or unique service.

### Investigation of St. Louis Hills Pharmacy

62. In August 2017, Affiant opened an investigation on St. Louis Hills Pharmacy (STL Hills), located at 4365 Chippewa Street, #100, St. Louis, Missouri. STL Hills was assigned OI case number ending in 277-9. Affiant received information regarding STL Hills paying kickbacks to physicians in exchange for the physicians sending prescriptions to the pharmacy, particularly expensive "pain cream" compounded prescriptions for Medicare, Medicaid, and Tricare patients. Y.B. and R.R. own STL Hills. Y.B. and R.R. are licensed pharmacists.

63. During the course of the STL Hills investigation, a search warrant was executed at the pharmacy, on August 22, 2017, (Warrant is currently under seal, case number is 4:17MJ6157PLC.). Affiant also requested and reviewed documents, and interviewed witnesses. Affiant obtained information indicating Dr. Lipede was one of the physicians involved in the kickback scheme, and caused the submission of false pain cream claims to Medicare, Medicaid, Tricare, and other healthcare insurance providers from the pharmacy.

64. During the execution of the search warrant, agents interviewed several of the STL Hills employees. One of the employees interviewed was a technician, A.F. The Federal Bureau of Investigation (FBI) had previously interviewed A.F., on July 20, 2016.

65. During her interview with the FBI, A.F. stated that Dr. Lipede was a physician

Case: 4:18-mj-05078-NAB   Doc. #: 9-2   Filed: 01/23/19   Page: 26 of 43   PageID #: 88
Case: 4:18-mj-05078-NAB   Doc. #: 7   Filed: 01/23/19   Page: 25 of 43   PageID #: 25

PageID #: 89

who faxed many prescriptions, sometimes fifty-to-eighty per day to STL Hills. Dr. Lipede would send one of his office staff, Janelle LNU, to participate in closed-door meetings with Y.B. at STL Hills. There were some prescriptions sent by Dr. Lipede and Janelle, which were for patients Dr. Lipede never saw or were deceased. STL Hills staff would receive calls a couple of times a week, from patients asking why they received a medication from the pharmacy or indicating that they had never seen Dr. Lipede as their physician. Medicaid denied claims for two of the Medicaid patients whom Janelle sent to STL Hills, because the patients were deceased. The STL Hills staff would write "void" on the prescription and give it to Y.B.

66.     During the search, E.D., a licensed pharmacy technician was interviewed by agents. E.D. stated that Dr. Lipede wrote for, and continued to write for, compounded pain prescriptions. Compounded pain prescriptions are ointments prepared by a pharmacy, which contain a combination of multiple potent medications (medications such as Ketamine, Baclofen, and Lidocaine). Dr. Lipede's nurse, Janelle, would call and come to STL Hills often. Janelle would have closed door meetings with Y.B. when she came to the pharmacy. E.D. advised a "ton" of Dr. Lipede's patients would call the pharmacy and complain because they were receiving pain cream medications that they did not want, or know about.

67.     On January 30, 2018, Y.B. was interviewed as part of a proffer agreement. Y.B. stated R.R. had arrangements with certain physicians, to provide prescriptions to STL Hills, and lab specimens to American Toxicology Institute (ATI), R.R.'s lab. When couriers picked up specimens for ATI, they would also pick up prescriptions for STL Hills. Y.B. would receive forty prescriptions at a time from the ATI couriers. Y.B. stated, sometimes R.R. would be the one to bring the stack of prescriptions from the physician offices. R.R. would pay himself 30% of the profit, from the prescriptions written by the physicians, in which R.R. had arrangements.

Dr. Lipede was one of those physicians.

### Kickbacks

68.     According to Y.B., all of the physicians would come to STL Hills, or ATI, to meet

with R.R. and M.A., owner of Imran Pharmacy (Imran). M.A. organized IRM Enterprises, LLC

(IRM), in the state of Missouri on July 14, 2010, and IRM owns Imran. R.R. had been the

Pharmacist in Charge, and Pharmacy Manager, at Imran. R.R. had previously been married to

M.A.'s wife's cousin.

69.     R.R. and M.A. both had signatory authority on several different bank accounts.

Two of those accounts were for IRM and Iqra Investment, LLC (Iqra). Iqra was organized in the

state of Missouri by M.A. on February 13, 2013. There was a third individual with signatory

authority on the Iqra bank account, E.H. E.H. owned and operated several businesses, to include

Integrity Health Marketing Solutions, LLC (Integrity). A review of the bank accounts for R.R.,

Iqra, and Integrity was conducted. The review revealed funds moving from R.R.'s personal

account, to Iqra, to Integrity, and Integrity wrote checks to physicians, such as Dr. Lipede. The

physicians receiving checks from Integrity, were the same physicians Y.B. identified as having

arrangements with R.R. to provide prescriptions to STL Hills and labs to ATI.

70.     A review of Medicare claims data for STL Hills, from January 2012 to January

2016, revealed that Dr. Lipede was ranked as the number two prescriber for STL Hills by the

dollar amount of claims paid. Dr. Lipede wrote the second highest number of prescriptions, a

total of 3,923, but he caused the highest reimbursement from Medicare to STL Hills, a total of

$791,363.00, indicating Dr. Lipede was writing a significant number of expensive prescriptions.

A review of Medicaid claims data revealed that Dr. Lipede wrote 13,867 prescriptions, which

caused STL Hills to be reimbursed $1,333,490.63.

## **Review of Medicare Data**

71.    Affiant requested Medicare prescription drug claims, from January 2013 to January 2018, for which Dr. Lipede was the prescriber.  A review of those claims revealed that Imran was the top paid pharmacy, for prescriptions written by Dr. Lipede.  During this time period, Medicare paid Imran a total of, $5,284,060.00 for prescriptions written in Dr. Lipede's name.  The fourth highest paid pharmacy was STL Hills, which received $1,020,138.00, from Medicare.  The most prescribed drug was Oxycodone/Acetaminophen, a Schedule II controlled substance (Brand names include Endocet, Percocet, and Roxicet), with 7,048 prescriptions, resulting in $613,494.00 in Medicare reimbursements to pharmacies for these medications.  The highest Medicare reimbursed prescription was OxyContin, also a Schedule II controlled substance, resulting in $1,274,539.00 in Medicare reimbursements, for 1,298 prescriptions.  Both the highest prescribed, and the highest paid, medications are Schedule II controlled substances.  Dr. Lipede is listed with the Board of Healing Arts and Medicare as a thoracic surgeon, yet he does not perform surgeries.  Dr. Lipede is not a pain medicine specialist.

## **Review of Medicaid Data**

72.    Affiant requested Medicaid prescription drug claims, from January 2013 to February 2018, for which Dr. Lipede was the prescriber.  A review of those claims revealed that Imran was the top paid pharmacy for prescriptions written by Dr. Lipede.   Imran received $4,857,955.59 in Medicaid reimbursements for prescriptions written by Dr. Lipede.  The third highest paid pharmacy was STL Hills, which received $1,421,110.16 from Medicaid.  The most prescribed controlled drug was Oxycodone/Acetaminophen (Brand names include Endocet, Percocet, and Roxicet) with 9,836 prescriptions, which resulted in $501,868.12 in Medicaid reimbursements to pharmacies.  The highest Medicaid reimbursed controlled drug was

27

OxyContin, for which Medicaid reimbursed pharmacies $518,134.52, for 1,558 prescriptions for which Dr. Lipede was the prescriber. Both the highest prescribed, and the highest paid, medications are Schedule II controlled substances.

## COMPUTER

### Considerations Regarding Computer Equipment

73.     As detailed above, there is probable cause to believe that evidence of the commission of the criminal offenses described herein will be contained in computer equipment, including multiple computers, located at the premises to be searched.

74.     Affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (a) the objects themselves may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of the crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

75.     The Federal Bureau of Investigation employs personnel with specialized knowledge, training, and experience relating to computer and digital evidence. Based on my knowledge, training, and the knowledge, training, and experience of other agents and inspectors with expertise in computer and electronic/digital evidence, I am aware of the following:

a.                  Hardware - Computer hardware includes all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment, which has remote access capabilities) including all equipment, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing

28

units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables, and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.　　　　Software - Computer software is digital information, which can be interpreted by a computer, and any related components to direct the way they work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interprets, and communication programs.

c.　　　　Documentation - Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d.　　　　Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. Data security hardware may include encryption devices, chips, or circuit boards. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress,

29

hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

       e.         Computer hardware and computer software may be utilized to store information or data in the form of electronic magnetic coding on computer   media or on media capable of being read by a computer or computer related equipment.  Such media includes, for example, fixed hard drives and removable hard drive cartridges and cards, laser disks, tapes, floppy disks, memory sticks, CD ROMs, DVDs, and any other media capable of storing magnetic coding.

       f.         Addresses:  Every device on the Internet has an address that allows other devices to locate and communicate with it.  An Internet Protocol ("IP") address is a unique number that identifies a device on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Most Internet service providers ("ISPs") control a range of IP addresses.  When an ISP or other provider uses dynamic IP addresses, the ISP assigns one of the available IP addresses in the range of IP addresses controlled by the ISP each time a user dials into the ISP to connect to the Internet.  The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.  Once the user disconnects, however, that IP address becomes available to other customers who dial in at a later time.  Thus, an individual customer's IP address normally differs each time he dials into the ISP.  A static IP address is an IP address that is assigned permanently to a given user or computer on a network.  A customer of an ISP that assigns static IP addresses will have the same IP address every time.  Other addresses include Uniform Resource Locator (URL) addresses, such as "http://www.usdoj.gov," which are typically used to access web sites or other services on

Case: 4:18-mj-05078-NAB   Doc. #: 9-2   Filed: 01/23/19   Page: 32 of 43   PageID #: 52
Case: 4:18-mj-05078-NAB   Doc. #: 7   *SEALED*   Filed: 01/22/19   Page: 32 of 43   Page ID #: 189
PageID #: 95

remote devices. Domain names, host names, and machine addresses are other types of addresses associated with Internet use.

g.          Log files are computer files that contain records about system events and status, the identity and activities of users, and anomalous or unauthorized computer usage. Names for various log files include, but are not limited to: user logs, access logs, audit logs, transactional logs, and apache logs. Logs can also maintain records regarding the identification of users on a network, as well as Internet sites accessed by the computer.

h.          Electronic mail ("e-mail") is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends e-mail, it is typically initiated at the user's computer, transmitted to a mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server may allow users to post and read messages and to communicate via electronic means.

76.      Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, Affiant knows that computer data can be stored in a variety of systems and storage devices including hard drives, floppy disks, compact disks, magnetic tapes, and memory chips. Affiant also knows that during the search of a business, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

i.          Volume of evidence: Computer storage devices (like hard disks, diskettes, tapes, CDs, DVDs, and thumb drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine

all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

ii.         Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and/or from destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

iii.         Computer files or remnants of such files can be recovered months, even years, after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after the file has been allocated to a set of block storage space - for long periods before they are overwritten. In addition, a computer's operating system may also keep a record

32

of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage, capacity, and computer habits.

iv.          Searching computer equipment for evidence described can require a range of computer forensic analysis and techniques. Criminal can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches"). Accordingly, Affiant requests permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site analysis of the hardware for the evidence described if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

77.     Your affiant submits that there is probable cause to believe that the files of the following patients are evidence of and constitute property used in the commission of the criminal offenses listed in Paragraph 9 *supra*:

33

| Patients Who Died Within 30 Days of Receiving Controlled Scripts signed by Dr. Lipede | DOB |
|---|---|
| ███████████ | ████ |
| ██████ | █████ |
| ████ | █████ |
| ██████ ███ █ | ████ |
| ████████ █ | █████ |
| █████████ █ | █████ |
| ██████ ████ | █████ |
| ██████ ████ | █████ |
| ██████ | ████ |

| Patients Who Were Seen on the Weekend and Received Controlled Scripts signed by Dr. Lipede | DOB |
|---|---|
| ████ ████ █ | █████ |
| █████ ████ | █████ |
| ████ ██████ █ | ████ |
| █████ █████ █ | ████ █ |
| █████████ | █████ |
| ████ ██████ | █████ |
| █████ ████ █ | █████ |
| ████ ██ | █████ |
| █████████ | ██████ |
| █████ | █████ |
| ████ █ | █████ |
| ██████ █ | █████ |

| Patients Who Traveled Long Distances and Received Controlled Scripts signed by Dr. Lipede | DOB |
|---|---|
| ██████ | █████ |
| ████ █ | █████ |
| ████ ██████ | █████ ) |
| █████████ █ | █████ |
| █████████ █ | █████ |
| █████ █ | █████ |
| ████████ █ | █████ |
| █████ | █████ |
| ██████ █ | █████ |

| Patients Who Traveled Long Distances and Received Controlled Scripts signed by Dr. Lipede | DOB |
|---|---|
| ████████ █ | ███ |
| ███ ████ █ | ███ |
| ███ ███ | ███ |
| ████ █ ███ █ | ███ |
| ███ ████ █ | ███ |
| ███ ███ █ | ███ |
| ████ █ | ███ |
| ████ ███ █ | ███ |
| ████ ███ █ | ███ |
| ███ ███ █ | ███ |

| Patients Who Received Controlled II Scripts Signed by Dr. Lipede While He Was Out Of Town | DOB |
|---|---|
| ████████████ | 10/26/1962 |
| ███ ███ | ███ |
| ███ ███ | ███ |
| ███ ███ | ███ |
| ███ ███ | ███ |
| ████ ███ █ | ███ |
| ████ ███ █ | ███ |

78. For purposes of protecting patient privacy, Attachment B to the present Application and Warrant incorporates a redacted version of the above Table, listing only patient initials, rather than full names, and dates of birth, and without the headers included in the above Table.

## CONCLUSION

79. Based on the foregoing, there is probable cause to believe that Dr. Lipede, through his employees and agents, falsified or caused to be falsified patient medical records and other records maintained by MHC and PHGM, fraudulently submitted claims, made false statements and representations to Medicare, Medicaid, Tricare, and private insurance in

Case: 4:18-mj-05078-NAB   Doc. #: 9-2   Filed: 01/23/19   Page: 37 of 43   PageID #: 144
Case: 4:18-mj-05078-NAB   Doc. #: 7   Filed: 01/23/19   Page: 37 of 43 PageID #: 100
PageID #: 100

violation of the law, and furthered a scheme to defraud private insurance, Tricare, Medicaid, and Medicare.  Based on the investigation to date, there is also probable cause to believe the evidence, fruits and instrumentalities of the crimes set forth herein may be found inside the premises identified as MHC, 9231 West Florissant Avenue, Ferguson, Missouri and PHGM, 960 S. Highway Drive, Fenton, Missouri.

80.     The disclosure of the contents of the Application, Affidavit, and Search Warrant could compromise and jeopardize an ongoing investigation and witnesses who have provided information to the Department of Health and Human Services, Office of Inspector General.

81.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and seizure warrant.  I believe that sealing this document is necessary because the items to be seized are relevant to the ongoing investigation.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

STACEY JORDAN
Special Agent
Dept. of Health and Human Services
Office of the Inspector General

Subscribed and sworn to before me  on March 23, 2018:

HONORABLE NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

36





## PROPERTY TO BE SEARCHED

### Maranatha Health Care, PC (MHC)

MHC located at 9231 West Florissant Avenue, Ferguson, Missouri, is a single-story tan brick building with dark stone front, as pictured in Attachment A. On the front of the building is a green canopy over the entrance, and there is a large white sign to the right of the entrance, on which the following words and numbers appear: "Maranatha PHYSICIANS," and the phone number of the clinic. The front of 9231 West Florissant Avenue has glass entry doors, with the number "9321" above the doorway. There is a handicap accessible access ramp to the left of the entrance. On the right side of the building, there are five windows and another door, which is also covered by a green canopy.

## ATTACHMENT B

The following is a listing of items and documents to be searched for and seized from the location to be searched:

1.     Patient files for the list of patients shown below. For the purposes of this Search Warrant, "patient files" means any evidence that refers or relates to a patient's care or medical treatment, including but not limited to assessments, plans of care, care plan supplements, case notes, history and physicals, discharge summaries, operative records, treatment summaries, progress notes, nursing notes, prescriptions, admission forms, intake forms, referral documents, emergency visit forms, physician's orders, discharge forms, autopsy or coroner's reports, laboratory or diagnostic tests and results, treatment histories, x-rays, any correspondence or contact with the patient about MHC, PHGM, and/or Dr. Lipede's care and billing for the patient, and/or any other documents related to a patient's treatment and receipt of health care services.

2.     Patient billing records for the list of patients shown below.  For the purposes of this Warrant, "billing records" means any evidence that relates to any billing claims, requests, or demands for payment from any health care benefit program or insurance company for any health care services, including but not limited to claim forms, superbills, remittance advices, exception, recoupment or adjustment correspondence, billing summaries, account details, checks, health care program correspondence, provider agreements, or other related documents.

PATIENT FILES TO BE SEIZED:

**NAME**

| |
|---|
| R.A.D. |
| S.M.B. |
| T.B. |
| W.E.H. |
| S.W.J. |
| M.S.J. |

| |
|---|
| M.D.L. |
| T.L.M. |
| D.D.W. |
| A.L.W. |
| J.D.B. |
| A.R.B. |
| G.L.F. |
| J.R.F. |
| E.M.H. |
| M.L.H. |
| G.L.H. |
| A.H. |
| H.K.H. |
| R.L.J. |
| R.J.J. |
| S.J.K. |
| S.V. |
| M.W. |
| B.A. |
| S.E.B. |
| R.C. |
| M.C.C. |
| R.L.C. |
| J.L.D. |
| M.S.G. |
| J.H. |
| B.K.H. |
| O.L.J. |
| Q.E.J. |
| R.L.K. |
| G.M. |
| M.O.P. |
| W.E.R. |
| J.L.R. |
| L.L.S. |
| K.J.S. |
| J.N.S. |
| M.J.S. |
| J.L.A. |
| L.C. |
| A.G.P. |

| L.S. |
| R.A.S. |
| L.S.T. |
| K.A.W. |

3.      Appointment calendars, personal calendars, travel records, activity reports, or any other document showing patient appointment/schedules, daily activities/travel, or the schedules for MHC, PHGM, their employees, independent contractors, owners, and Dr. Lipede.

4.      Any prescriptions that are blank, incomplete, altered, pre-signed, pre-dated, post-dated and/or containing original or copied signatures suspicious in nature.

5.      Patient sign-in and/or sign-out sheets.

6.      Records reflecting communication between any representative of MHC, PHGM, and/or Dr. Lipede and any patient, family member and/or legal guardian or the patient, including documents about complaints about treatment, medical services, or billing issues, including but not limited to call-logs, letters, complaints, and notices of payments, rejections, denials, and credit adjustments.

7.      Staffing schedules and other documents that purport to document daily MHC and PHGM staffing.

8.      Business records of MHC, PHGM, and/or Dr. Lipede, including minute books or other records reflecting ownership of the business, assets and liabilities of the business, including bank records, tax return information and financial records relating to income received by and disbursements for the businesses.

9.      Records reflecting the bank accounts, credit card accounts, and/or financial records of MHC, PHGM, and/or Dr. Lipede, including but not limited to monthly statements, balance statements, spreadsheets, and/or bookkeeping documents.

10.     E-mail or other correspondence from or to Dr. Lipede, and the employees, independent contractors, and owners or MHC and PHGM concerning prescriptions, complaints, payments from other health care providers or individuals in the health care industry, payments for health care services, marketing, compound prescriptions, or cash payments.

11.     Standing physician orders/protocols, collaborative practice agreements, or written agreements between Dr. Lipede, MHC, and PHGM and any nurse, nurse practitioner, or any other health care provider.

12.     Any documents showing cash payments from patients for appointments and/or prescriptions for controlled substances, including ledgers or other books of accounts.

13.     Any documents showing complaints, allegations of illegal or unsafe activity, or similar claims from patients, family or friends or guardians of patients, pharmacists, other health care providers, or health care programs regarding Dr. Lipede's prescriptions for controlled substances and related medical treatment.

14.     Any documents or records from, or regarding, Integrity Health Marketing Solutions, St. Louis Hills Pharmacy, American Toxicology Lab, and Imran Pharmacy to include, marketing materials, payments, emails, correspondence, contracts, agreements, bank records, or other business documents.